**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  18 C 6718** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Michael M. ("Claimant")[1] brings a motion for summary judgment to reverse

the final decision of the Commissioner of Social Security ("Commissioner") that denied

Claimant's application for Disability Insurance Benefits ("DIB") under the Social Security Act.

42 U.S.C. §§ 416(i), 402(e), and 423.  The Commissioner has brought a cross-motion for

summary judgment seeking to uphold the Social Security Agency's ("SSA") decision finding

that Claimant is not disabled.  The parties have consented to the jurisdiction of the United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This Court has jurisdiction to hear this matter

pursuant to 42 U.S.C. §§ 405(g) and 138(c)(3).  For the reasons stated below, Claimant's motion

for summary judgment [8] is granted and the Commissioner's cross-motion for summary

judgment [19] is denied.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social
Security applicant in an opinion.  Therefore, only the claimant's first name shall be listed in the caption.
Thereafter, we shall refer to Michael M. as Claimant.

## I. BACKGROUND

### A.    Procedural History

On January 9, 2015, Claimant filed a disability application alleging a disability onset date of September 18, 2012.  His claim was denied initially on June 16, 2015 and upon reconsideration on December 14, 2015.  On October 4, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant.  The Appeals Council denied review of the ALJ's decision on August 5, 2018, making the ALJ's ruling the Commissioner's final decision.  (R. 1-6).  *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Plaintiff subsequently filed this action in the District Court on October 4, 2018.

### B.    Medical Evidence in the Administrative Record

#### 1.    Evidence from the Medical Record

Claimant suffers from neck and back pain, carpal tunnel syndrome, and low testosterone. His primary complaint, however, involves Crohn's disease.[2]  The medical record concerning that disorder is not entirely clear because Claimant lost his health insurance for a period of time during his alleged disability period.  Gastroenterologist Dr. Benjamin Schmid stated that Claimant was first diagnosed with Crohn's in 2001, (R. 557), but the first medical entry is a diagnosis in December 2012 by family physician Dr. William Crevier.  (R. 405).  Prednisone was prescribed in March 2014.  (R. 383).  By April 2015, Claimant was taking Remicade injections every seven weeks, as well as Imuran and Norco for pain.  (R. 405).  Dr. Schmid noted in May 2015 that Claimant experienced four to five bowel movements a day with occasional

---

[2] "Crohn's disease is an inflammatory bowel disease that causes chronic inflammation of the gastrointestinal tract."  https://www.crohnscolitisfoundation.org/what-is-crohns-disease (last visited Nov. 19, 2019).  Symptoms include persistent diarrhea, rectal bleeding, abdominal cramps and pain, and swelling and pain throughout the joints.  *Id.*

blood in the stool.  Dr. Schmid prescribed Norco, Prednisone, Imuran, and Humira to treat his symptoms.  (R. 513).

Claimant returned to Dr. Schmid throughout 2015.  The doctor noted in November 2015 that he had been taking Humira for several months without much improvement and "seldom has [a] good day."  (R. 498).  Dr. Schmid wanted Claimant to undergo a number of tests including a CT scan and a colonoscopy but he did not have insurance to pay for it.  (R. 499).  On June 13, 2016, Dr. Schmid noted that Claimant had sought emergency treatment the day before for abdominal pain and that a CT scan that had been done that showed small-bowel Crohn's.[3]  (R. 490).  In addition, Crohn's had given rise to arthritis that caused "chronic muclusoskeletal [sic] pain."  (R. 487).  Dr. Schmid noted that Claimant's Crohn's showed both "chronic exacerbation and acute exacerbation and that Claimant had not responded well to Imuran or Humira.  (R. 491).  Dr. Schmid stated in March 2017 that Claimant's Crohn's was "without complication."  (R. 490).  By January 2017, however, Dr. Benca Kurian noted Chron's "with complication" and prescribed OcyContin for both Crohn's and degenerative disc pain in Claimant's neck.  (R. 534).

### 2.      Evidence from the State-Agency Physicians and Consultants

On June 12, 2015, state-agency physician Dr. Reynaldo Gotanco issued a report concerning Claimant's condition.  He found that Claimant could occasionally lift or carry up to 50 pounds and could frequently lift or carry 25 pounds.  He could sit, walk, and stand for six hours each day.  Claimant could frequently climb stairs, balance, kneel, and crouch but could only occasionally climb ladders, stoop, or crawl.  (R. 69-70).

---

[3] Small-bowel Crohn's "is the most common type of Crohn's disease.  It affects the small intestine, known as the ileum, and the colon."  https://www.webmd.con/ibd-crohns-disease/crohns-disease/5-types-crohns-disease  (last visited Nov. 19, 2019).

State-agency expert Dr. James Greco issued a more restrictive assessment on December 10, 2015. He concluded that Claimant could only occasionally lift or carry 20 pounds and could frequently lift 10 pounds. Dr. Greco assessed the same restrictions for sitting, walking, and other exertional work activities that Dr. Gotanco had found. (R. 82-83). State-agency psychologist Dr. Darrell Snyder issued a report on December 11, 2015 that addressed the psychological implications of Claimant's physical impairments. Dr. Snyder found that "there were no mental issues alleged nor supported." (R. 81).

On May 16, 2015, Dr. Chukwa Emeka Ezike examined Claimant at the SSA's request and issued a report. Dr. Ezike noted that Claimant stated that his neck pain was intermittent and was associated with bilateral hand numbness but no weakness. His back pain was usually dull, occasionally sharp, and always present. Claimant showed mild diffuse tenderness in his abdomen with no guarding or rebound tenderness. He could perform toe and heel walking and had grip strength of four out of five in each hand. The range of motion in Claimant's shoulders, elbows, and wrists was normal. Dr. Ezike diagnosed a history of Crohn's disease, cervical and lumber degenerative disc disease, and a history of generalized arthritis. (R. 468-70).

### 3.    Evidence from Treating Physicians

Claimant's treating gastroenterologist Dr. Benjamin Schmid issued a report on April 4, 2017. Dr. Schmid stated that he began treating Claimant in 2007 and that Claimant had experienced "a very severe course" of Crohn's disease since he was first diagnosed with that disorder in 2001. Despite all treatment, Crohn's had not gone into remission since its onset. Disruptions in Claimant's health insurance had prevented him from taking the appropriate medications at times. He also experienced joint pain and total body pain as a result of colitis associated with arthritis. Dr. Schmid stated that Claimant would not be able to sit for long

periods of time as a result of his pain which is only somewhat alleviated by narcotics. Claimant would also be unable "to be on his feet for 6 of 8 hours in a workday" and would need to be absent "many days" each month. Abdominal pain, joint pain, and other aches would make it difficult for Claimant to concentrate. (R. 557-60).

### 4. Evidence from the Administrative Hearing

Claimant appeared at the April 4, 2017 administrative hearing and described his condition to the ALJ. He explained that he worked many jobs – including during his alleged disability period – as a unionized sheet metal worker. Claimant told the ALJ that he continued to work because he was afraid that he would be fired if he told his employer about his medical condition. He was able to continue working because his fellow employees often allowed him to sleep at work and covered for him when he took breaks. (R. 39).

Claimant described his primary problems as pain, fatigue, and gastrointestinal issues related to Crohn's disease. He has bowel movements that range from two to 20 times daily depending on whether he has a good day or a bad day. (R. 43). He experiences about seven or eight bad days each month and will go days without eating to prevent an onset of his Crohn's symptoms. (R. 46). Claimant stated that Crohn's causes constant pain that "kills" him. (R. 41). He takes Norco and morphine to alleviate it; OxyContin was also prescribed but Claimant's insurance would not pay for it. (R. 46). Claimant formerly took other medications, including Humira, but his ability to do so was interrupted at times by lapses in insurance coverage. He was currently taking Humira again at the time of the hearing and his gastroenterologist was trying to persuade his insurance company to increase coverage from one shot every two weeks to one every week. (R. 41).

Pain medication reduces his pain but Claimant still experiences pain at least at a level of six or seven out of ten each day. (R. 48). It also disrupts his sleep and leaves him fatigued. (R. 50). Claimant needs to nap during the day because he often sleeps only four to five hours a night. (R. 51). The ALJ did not inquire about Claimant's activities of daily living ("ADLs") in depth but Claimant testified that pain made it difficult for him to bend down or to walk and that he had generally restricted his activities as a result. (R. 49-59).

### C. The ALJ's Decision

On October 4, 2017, the ALJ issued a written decision finding that Claimant was not disabled. Applying the five-step sequential process that governs disability decisions, the ALJ found at Step 1 that Claimant had engaged in substantial gainful activity for some – but not all – periods between his alleged onset date and his last date insured.[4] His severe impairments at Step 2 included a spine disorder, carpal tunnel syndrome, hypogonadism, and irritable bowel syndrome/Crohn's disease. (R. 13). The ALJ found at Step 3 that none of these impairments met or medically equaled a listing either singly or in combination. (R. 13-14).

Before moving to Step 4, the ALJ evaluated Claimant's testimony on the frequency and severity of his symptoms and determined that the record did not support all that Claimant stated. The ALJ also assigned weights to the reports of the state-agency experts and the doctors who treated or examined Claimant. He gave little weight to the opinion of state-agency physician Dr. Gotanco but gave great weight to Dr. Greco's report. (R. 18). The ALJ also assigned great

---

[4] Since Claimant worked as a metal worker through his union, he worked for multiple short periods during this period. The ALJ found that Claimant had not engaged in substantial gainful activity during the following periods: October 2012 through December 2012; July 2013 through September 2013; January 2014 through March 2014; and July 2013 through December 2014. (R. 12). The ALJ stated that his findings after Step 2 "address the period(s) the claimant did not engage in substantial gainful activity." (R. 13).

weight to psychologist Dr. Snyder's report. (R. 19). Little weight was given to the report issued by treating physician Dr. Schmid. (R. 18).

Based on these findings, the ALJ stated that Claimant could perform light work as that term is defined under 20 C.F.R. § 404.1567(b) but that various accommodations would be required. Most importantly, the ALJ found that Claimant's Crohn's disease meant that "he would need to work within three minutes of a bathroom and would need to be allowed two unscheduled breaks of up to five minutes." (R. 14). Based on the testimony of the VE, the ALJ then found at Step 4 that Claimant would not be able to carry out his past work as a sheet metal worker. The VE stated, however, that jobs were available in the national economy to a person with Claimant's RFC. The ALJ therefore found at Step 5 that Claimant was not disabled. (R. 20-21).

## II. LEGAL ANALYSIS

### A.    The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental

impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting*

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the courtlooks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## III.   DISCUSSION

Claimant argues that remand is necessary because the ALJ (1) erroneously weighed the report of treating physician Dr. Schmid; (2) improperly assessed the Step 5 finding; (3) and incorrectly assessed Claimant's RFC and symptom testimony.

### A.      The ALJ's Assessment of Dr. Schmid's Report was Erroneous

On April 4, 2017, treating gastroenterologist Dr. Schmid issued a report to the ALJ.  Dr. Schmid stated that he began treating Claimant for Crohn's disease in 2007 and that Claimant had suffered from that disorder since 2001.  His Crohn's has been "very severe" and did not go into remission despite treatment with steroids, Imuran, Remicade, or Humira.  Dr. Schmid's treatment of Claimant was interrupted between 2011 and 2015 after Claimant lost his insurance.  Dr. Schmid noted that even during his earlier course of treatment Claimant often missed work due to his Crohn's and its associated joint pain.  Dr. Schmid found that Claimant experienced joint pain throughout his body as a result of his disease and that he would not be able to sit for

more than 30 minutes at a time because of it. He would therefore miss "many days" of work each month and could not sustain his job activities. Dr. Schmid also noted that pain inhibited Claimant's ability to concentrate and that the steroids he took caused anxiety, insomnia, and depression. (R. 557-60).

A treating source opinion like Dr. Schmid's report is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). An ALJ must offer "good reasons" for discounting a treating physician's opinion. That involves assigning a specific weight to the report by considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the ALJ's attention.[5] 20 C.F.R. § 404.1527(c)(2)-(6); *see also Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009).

The ALJ assigned little weight to Dr. Schmid's report. He began by noting that the ultimate decision of whether a claimant is disabled is reserved to the Commissioner. The regulations state that "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(d)(1). That is because statements on such issues are reserved to the Commissioner and – even if given by a medical source like Dr. Schmid – "are not medical opinions." 20 C.F.R. § 404.1527(d). In this case, however, Dr. Schmid never said that Claimant was disabled or that he was "unable to

---

[5] New regulations removed the treating physician rule in 2017, but only for claims filed after March 27, 2017. 20 C.F.R. § 404.1527c. For claims like plaintiff's that were filed before that date, the factors set out in 20 C.F.R. § 404.1527 continue to apply.

work."  Instead, he filled out a form that asked, in part, if he thought that Claimant "could sustain a job which requires him to be on his feet for 6 or 8 hours in a workday."  Dr. Schmid responded, "No, I do not."  (R. 557).  That is not the same as stating that Claimant could not carry out any work.  A person who cannot stand for six hours a day may still be able to perform sedentary work, which "requires 'frequent' (*i.e.* up to two-thirds of the workday) sitting and 'occasional' standing" for the remaining one-third of the day."  *Borski v. Barnhart*, 33 Fed.Appx. 220, 224 (7th Cir. 2002) (citing SSR 96-9p).[6]

Dr. Schmid also stated in another part of his report that Claimant would experience difficulty sitting for long periods of time due to his "severe pain."  (R. 558).  Like Dr. Schmid's conclusion on Claimant's ability to walk, that is not a finding of disability; rather, it constitutes an evaluation of the severity of Claimant's impairment based on the treating physician's expert observations.  Such findings are clearly "medical opinions" that fall within the scope of what a treating source is permitted to describe in his or her expert report.  *See* SSR 96-2p (stating that "'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight").  Even if *part* of Dr. Schmid's statement involved an issue reserved to the Commissioner, moreover, that did not entitle the ALJ to rely on that fact as a reason for rejecting *all* of his findings.  "A treating physician's opinion may have several points; some may be given controlling weight while others may not."  *McMurtry v. Astrue*, 749 F.Supp.2d 875, 888 (E.D.Wis. 2010).

Instead of considering the various parts of Dr. Schmid's opinion with care, the ALJ made a series of generic claims that did not address any specific finding in the report.  He stated, for

---

[6] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators."  *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).  They do not have the force of law or a regulation, though they are binding on the SSA.  *Id*.

example, that Dr. Schmid's treatment notes did not support the expert's report without citing anything in the notes or identifying the findings they purportedly contradicted. The Court agrees that Dr. Schmid's notes do not include the specific limitations that he identified in his report. In itself, that was not a ground for doubting Dr. Schmid's report because "the mere absence of detailed treatment notes, without more, is 'insufficient grounds for disbelieving the evidence of a qualified professional.'" *Brown v. Colvin*, 845 F.3d 247, 253 (7th Cir. 2016), *quoting Hermann v. Colvin*, 772 F.3d 1110, 1111 (7th Cir. 2014); *Rockwell v. Saul*, 781 Fed.Appx. 532, 537 (7th Cir. 2019) ("Dr. Smith's failure to mention in his treatment notes the limitations he included in his physical capacities report does not imply that Dr. Smith exaggerated in the latter.").

The Court recognizes that the ALJ briefly addressed Dr. Schmid's treatment notes at an earlier point and that his decision should be considered as a whole. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (noting that "it is proper to read the ALJ's decision as a whole"). Nevertheless, the ALJ never addressed why the notes cast doubt on Dr. Schmid's report, and the Court finds little – if any – link between the ALJ's observations and his dismissal of the report. The ALJ noted, for instance, that Dr. Schmid stated in August 2016 that Claimant was only having two to three bowel movements a day. (R. 17). That would undermine Dr. Schmid's conclusions if the report stated something different or suggested that its findings assumed that Claimant had a greater number of bowel movements. The report does not address these issues, however, and the ALJ failed to build any bridge between his observation and the dismissal of it.

The ALJ also pointed out that Dr. Schmid's notes state that Claimant regained medical insurance by June 2016 and that his Humira injections were increased to once a week by March 2017. It is unclear what relevance the ALJ thought this had to Dr. Schmid's report because the

never explained why an *increase* in the number of Humira injections that Claimant required undermines Dr. Schmid's findings. To the contrary, the need for additional medication suggests that a claimant's symptoms were not controlled and that more aggressive treatment was necessary – a finding that supports rather than undermines what Dr. Schmid stated. *See Brown*, 845 F.3d at 253 (noting that an increase in medication supports a treater's conclusions). It also does not mean that Claimant's condition was well controlled after more injections were given; indeed, the ALJ overlooked that Claimant testified that Humira was less effective at the time of the April 2017 administrative hearing than it had been before. (R. 41).

Even if double doses of Humira improved Claimant's symptoms after March 2017, moreover, the ALJ never addressed what relevance more Humira or new health insurance had to Claimant's condition prior to March 2017. Claimant's alleged disability period began on September 18, 2012. The ALJ overlooked that Dr. Schmid's report stated that Claimant only had "partial improvement" when Humira was restarted in 2015 and had not gone into remission "in spite of maximum medical treatment." (R. 557). Dr. Schmid's treatment notes confirm these statements. He wrote on June 13, 2016 that Claimant "[h]as not responded well to [I]muran and [H]umira in [the] past." (R. 490). On November 9, 2015, he noted that Claimant had been "[o]n [H]umira for several months [and was] [s]till not in remission." (R. 499). The ALJ ignored these findings that were important in deciding the degree to which Dr. Schmid's report accurately described Claimant's condition during the full scope of his alleged disability period. By disregarding them, the ALJ selected evidence that was favorable to his conclusion while ignoring statements that supported Dr. Schmid's assessment. That constitutes "a classic case of 'cherry-picking' that the Seventh Circuit has denounced time and time again." *Newman v.*

*Colvin*, 211 F.Supp.3d 1126, 1131 (N.D.Ind. 2016) (citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)).

The ALJ also noted that Dr. Schmid's treatment notes stated that Claimant experienced abdominal pain from September 2015 to March 2016. (R. 17). The Commissioner claims that finding is undermined by the May 2015 observation of examining physician Dr. Ezike that Claimant's abdomen only showed "mild non-specific diffuse tenderness." (R. 469). This argument fails to support the ALJ's decision on several grounds. First, the ALJ did not cite Dr. Ezike's finding in his discussion of Dr. Schmid's report. (R. 18). The Commissioner may not defend an ALJ's decision on a ground that the ALJ did not rely on. *See Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010).

Second, even if the ALJ had done so he did not explain why the absence of tenderness during a single exam in May 2015 contradicted Dr. Schmid's findings for the period that Dr. Schmid referenced – September 2015 to March 2016. Claimant told the ALJ that he experienced good days and bad days with Crohn's disease. (R. 43). In fact, Dr. Schmid himself noted that Claimant did not always have abdominal pain. (R. 482). Despite these indications that Claimant's distress came and went, the ALJ never considered whether the symptoms of Crohn's disease can be expected to fluctuate over time. *See* [https://www.nhs.uk/conditions/ crohns-disease/symptoms](https://www.nhs.uk/conditions/crohns-disease/symptoms) (last visited Nov. 6, 2019) (noting that "the symptoms of Crohn's disease can be constant or may come and go every few weeks or months"). Without a medical expert available to address the fluctuating nature of Claimant's pain, the ALJ had no ground for discounting Dr. Schmid's report because Dr. Ezike did not assess pain on one occasion.

Third, neither the Commissioner nor the ALJ addresses the full spectrum of Claimant's Crohn's-related pain. In addition to abdominal pain, Dr. Schmid also said that Crohn's caused

joint pain that inhibited Claimant's ability to work. (R. 557); *see also* https:// www. crohnscolitisfoundation.org sites/default/files/legacy/assets/pdfs/arthritiscomplications (last visited Nov. 6, 2019) ("Arthritis, or inflammation (pain with swelling) of the joints, is the most common extraintestinal complication of" Crohn's). Indeed, Dr. Schmid referenced joint pain as the reason why Claimant would not be able to be on his feet for six to eight hours a day. (R. 557). Many of Dr. Schmid's treatment notes state that Claimant experienced such pain, (R. 479, 485, 492, 493, 499), and specifically link his Crohn's with a diagnosis of arthritis. (R. 487, "Colitis associated arthritis"). The ALJ briefly noted that Dr. Schmid referenced "joint pain" in his report but overlooked everything that Dr. Schmid stated in his treatment notes and never recognized that Claimant had been diagnosed with a form of arthritis.[7]

Instead of citing medical evidence to contradict Dr. Schmid's finding, the ALJ relied on the fact that the record does not mention that Claimant missed workdays because of pain. (R. 18-19). The Court is unable to follow the basis of the ALJ's reasoning on this topic. Neither the ALJ nor the Commissioner has explained why the record should be expected to reflect the number of workdays that Claimant missed – or the reason for such absences. Like most administrative records, the one in this case contains yearly income accounts (from 1987 through 2014) that do not include more minute information like the number of days that Claimant attended or missed work. (R. 199-200).

The ALJ relied on the earnings statements to find that Claimant had a "good consistent work history," (R. 15), thereby implying that his condition could not have been as serious as

---

[7] In other parts of his decision, the ALJ discussed neck and back pain stemming from what the ALJ characterized as Claimant's "spine disorder." (R. 13, 16). Having overlooked that at least some of Claimant's joint pain was caused by Crohn's, the ALJ did not address whether this discussion of Claimant's back pain accounted for all of his joint pain. On remand, the ALJ should consider all of the pain that stemmed from Claimant's impairments.

either Claimant or Dr. Schmid said that it was. However, the ALJ overlooked that Claimant testified that he did *not* work as consistently as the record implied. He was afraid to let his employer know about his medical condition "because once you say something like that, they find a reason to get rid of you. If you can't do the job, they don't want you." (R. 39). The ALJ should have recognized that "the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003). Claimant testified that his work situation strongly resembled this job scenario. He stated that he continued to work despite his impairments only with informal accommodations that his employer either did not notice or did not mind. Claimant explained that instead of asking for leave he relied on his co-workers for help by getting them to let "me sleep at work and let me take a break and . . . cover for me." (R. 39). The ALJ was required to account for Claimant's explanation of his work history and explain (1) why the ALJ did not accept it or (2) why it did not confirm what Dr. Schmid stated in his report. By ignoring all that Claimant said that was relevant to these issues, the ALJ again selectively chose facts that bolstered his finding and disregarded evidence that contradicted it. *See Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010) (stating that an ALJ cannot "cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding").

Dr. Schmid's report was of particular importance to the ALJ because Dr. Schmid was a gastroenterologist who treated Claimant from 2007 through the date of the ALJ's decision. The regulations require an ALJ to consider a medical expert's specialty and the length of his or her treatment of the claimant. 20 C.F.R. § 404.1527(c)(2)(ii) & (v). The ALJ recognized at one point in his decision that Dr. Schmid had specialized knowledge about Claimant's condition. (R.

17).  However, the ALJ did not mention that fact in his discussion of the report or give any indication that he considered it as part of his evaluation.  The ALJ also overlooked that Dr. Schmid began treating Claimant in 2007.  That made Dr. Schmid more familiar with Claimant's condition than any other medical expert was.

It was important for the ALJ to have accounted for Dr. Schmid's expertise and the length of treatment because he gave great weight to the opinion of the state-agency expert Dr. Greco who never examined Claimant and did not identify a medical specialty.[8]  The regulations advise ALJs that they should generally "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not."[9]  20 C.F.R. § 404.1527(d)(1); *see also Criner v. Barnhart*, 208 F.Supp.2d 937, 954 (N.D.Ill. 2002).  The ALJ was not *required* to favor Dr. Schmid over Dr. Greco but he was obligated to explain with greater care why he rejected the opinion of a Crohn's specialist who knew Claimant's condition better than any other examining or non-examining medical expert.  *See Simon-Leveque v. Colvin*, 229 F.Supp.3d 778,

_____

[8] Since this case already requires remand, the ALJ should restate the reason for giving great weight to Dr. Greco's opinion.  The ALJ summarized the expert's findings but did not explain why he gave it great weight other than to state that "it is consistent with the record as a whole."  (R. 18).  However, the ALJ himself pointed out that Dr. Greco did not account for the limitations that stemmed from Crohn's disease.  (R. 18).  In the form asking Dr. Greco to explain the basis for his RFC restrictions, the only Crohn's-related evidence he cited was a 2010 diagnosis.  (R. 82).  Like the ALJ, therefore, Dr. Greco did not recognize that Dr. Schmid diagnosed Claimant with Crohn's-related arthritis and was unaware of the full treatment that Claimant received.  The ALJ is reminded that "[t]he opinions of non-examining experts are subject to stricter assessment standards than those of treating physicians."  *Dorion v. Colvin*, No. 13 C 4721, 2015 WL 2398405, at *2 (N.D.Ill. May 18, 2015); *see also* SSR 96-6p, 1996 WL 374180, at *2 ("The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.").

[9] The Commissioner cites the consulting report of Dr. Ezike to support the ALJ's rejection of Dr. Schmid's report even though as stated above, *supra*  at p. 14, the ALJ did not specifically rely on Dr. Ezike's report in his analysis of Dr. Schmid's.  Even if the ALJ had done so, the ALJ should have noted that Dr. Ezike was not a gastroenterologist, only examined Claimant once, and did not express any opinion on Claimant's exertional capacity.  (R. 467-470).  Moreover, the ALJ did not consider the weight that should be given to Dr. Ezike's report.  *See David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D.Ill. 2006) ("The weight given to a . . . physician cannot be implied").  That makes it impossible to determine the significance that the ALJ gave to Dr. Ezike.  *See Craft*, 539 F.3d at 677.

789 (N.D.Ill. 2017) (stating that an "ALJ must explain why he is rejecting the opinion of a cardiovascular specialist in favor of a general practitioner and non-examining physicians"); *see also Suess v. Colvin*, 945 F.Supp.2d 920, 932 (N.D.Ill. 2013) ("An ALJ may reject the opinion of a treating physician in favor of the opinion of a non-treating physician where the non-treating physician has special, pertinent expertise and where the issue is one of interpretation and knowledge of the case rather than one of judgment based on observations over a period of time."). Having failed to do so, remand is required so that the ALJ can state his reasoning more carefully and build a logical bridge between the record and his assessment of the expert report.

**B.      Remaining Issues**

Because this case already requires remand, the Court only briefly addresses Claimant's remaining objections to the ALJ's decision.

### 1.      The ALJ Should Reassess Claimant's Symptom Testimony and the RFC Assessment

The Court agrees with Claimant that the ALJ failed to properly explain the basis for the ALJ's symptom analysis. The ALJ stated that Claimant had a "good consistent work history." (R. 15). The ALJ's reasoning on this issue was not clear but he implied that it undermined Claimant's testimony because he "was able to work above the substantial gainful activity level after the alleged onset date." (R. 15). Contrary to the ALJ's finding, however, courts have repeatedly held that a consistent work history *supports* what a claimant describes about his or her symptoms. *See*, *e.g.*, *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (stating that "a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability"); *Knapp v. Berryhill*, 741 Fed.Appx. 324, 329 (7th Cir. 2018). Although a good work record does not – in itself – prove a claimant's allegations, *Summers v. Berryhill*,

864 F.3d 523, 528-299 (7th Cir. 2017), the ALJ could not cite Claimant's record against Claimant without explaining his reasons for doing so.

Claimant told the ALJ that he was not always able to obtain medical treatment because he lacked insurance. The ALJ called his testimony on this topic into doubt by noting that Claimant "could afford smoking one and a half packs of cigarettes daily" – apparently assuming that the cost of cigarettes could have paid for health insurance. (R. 16). Even if that were true, the ALJ had no ground for citing Claimant's smoking habit to question his symptom testimony. The Seventh Circuit has explained that the addictive nature of smoking makes it "an unreliable basis on which to rest a credibility determination." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000); *see also Suess*, 945 F.Supp.2d at 930. Smoking can contradict a Claimant's testimony if the evidence shows a direct link between smoking and the claimant's symptoms, *Rousey v. Heckler*, 771 F.2d 1065, 1069-70 (7th Cir. 1985), but the ALJ did not cite anything to support such a conclusion.

The Commissioner argues that Dr. Ezike's consultation report contradicts Claimant's testimony on several points. Like the ALJ, the Commissioner points out that Claimant told Dr. Ezike that he had "no significant difficulties with sitting." (R. 468). No adverse conclusion can be drawn from that statement, however, because Dr. Ezike also noted that Claimant stated that he could only sit for 15 to 20 minutes at a time. A person who is limited to 20 minutes of sitting – a restriction that would prohibit Claimant from carrying out the ALJ's RFC requirements – clearly has a "significant" restriction. Dr. Ezike also wrote that Claimant said that he had "no bowel . . . dysfunction." (R. 467). Whatever Claimant meant by that, a person who suffers from Crohn's disease that is not in remission despite the powerful medications he takes by definition has a dysfunctional bowel. *See* https://www.mayoclinic. org/diseases-conditions/crohns-disease/

symptoms-causes/syc-20353304 ("Crohn's disease is an inflammatory bowel disease.") (last visited on Nov. 13, 2019).

The ALJ also failed to properly address Claimant's pain. The ALJ discounted Claimant's testimony about back pain by referring to various medical notes that summarized aspects of the treatment that Claimant received for his back. (R. 16). The ALJ provided no explanation of why these notes contradicted Claimant's statements. That fails to build a bridge between the record and the ALJ's finding because – as many courts have stated – an ALJ may not merely summarize the evidence and claim without further explanation that the ALJ's symptom analysis or RFC finding is based on it. *See, e.g., Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept. 26, 2018); *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480, at *4 (N.D.Ill. May 6, 2015); *Chuk v. Colvin*, No. 13 C 8409, 2015 WL 6687557, at *8 (N.D.Ill. Oct. 30, 2015).

The same is true for Claimant's colitis-related arthritis. The ALJ noted at one point that Dr. Schmid said that Claimant had Crohn's disease and "joint pain" but he neither recognized that Claimant's arthritis was a symptom of Crohn's disease nor addressed it at any point in the decision. (R. 18-19). Insofar as the ALJ reasoned that the objective record did not support Claimant's allegations, an "ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). When objective evidence is lacking, an ALJ must consider factors such as the pain medications that a claimant takes. *See* SSR 16-3p, 2017 WL 5180304, at *8. The ALJ noted that Claimant testified that he took Norco and morphine for pain – overlooking that he was also prescribed OxyContin – but never explained why that did not support the level of pain that Claimant alleged that he experienced. *See Goble v. Astrue*, 385 Fed.Appx. 588, 591 (7th Cir. 2010) ("We have deemed it improbable that a claimant would

undergo pain-treatment procedures such as heavy doses of strong drugs . . . or that doctors would prescribe these treatments if they thought she were faking.").

The ALJ summarized a number of Claimant's ADLs, (R. 15), but failed to evaluate them or to explain what relation they had to the ALJ's symptom evaluation. Claimant explained, for example, that pain prevented him from sleeping and that he needed to nap during the day. (R. 15). Indeed, Claimant stated that his pain could be so intense at times that he would "go days without sleep." (R. 244). The ALJ did not address that issue or give any explanation of why he disbelieved what Claimant stated. That was erroneous because an ALJ must "articulate his reasons for rejecting" a claimant's allegations of fatigue. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

Finally, the ALJ did not properly inquire into one of Claimant's most important symptoms: the bowel movements associated with Crohn's disease. The ALJ accommodated Claimant's need to go to the bathroom in the RFC assessment by allowing him two unscheduled breaks of up to five minutes each. (R. 14). The number and time of breaks were crucial to the RFC because the VE told the ALJ that additional unscheduled breaks or breaks that required longer periods of time would make Claimant unemployable. (R. 59). Nevertheless, the ALJ never asked Claimant if five minutes were sufficient for his medical needs and did explain what supported the length of the unscheduled bathroom breaks in the RFC. The ALJ also failed to cite any medical evidence supporting the limitation to five minutes.

Without addressing these issues, the ALJ failed to explain how he reached the RFC assessment or why it properly accommodated Claimant's impairments. SSR 96-8p requires the RFC assessment to "include a narrative describing how the evidence supports each conclusion, citing specific medical fact (e.g., laboratory findings) and nonmedical evidence (e.g., daily

activities, observations). 1996 WL 374184, at *7. Contrary to this directive, the ALJ summarized the record without explaining the basis for his conclusion. That was inadequate for the reason state above, *supra*. The ALJ also adopted the RFC findings of Dr. Greco but admitted that Claimant's Crohn's-related restrictions were not included in the expert's report. (R. 18, "The only limitation not addressed is due to Crohn's disease.").

Notwithstanding that omission, the ALJ claimed that Dr. Greco's RFC accommodated Claimant because his Crohn's disease was "under control with symptoms no worse than [the] additional breaks addressed in my [RFC]." (R. 18). Far from being under control, Dr. Schmid said that Claimant's "very severe" disorder was *not* in remission "in spite of maximum medical treatment." (R. 557). The ALJ had no basis for rejecting Dr. Schmid's conclusion without first giving good reasons for the weight he gave to the report. Moreover, Claimant's need for bathroom breaks was only *one* of the symptoms that stemmed from Crohn's disease. Dr. Schmid told the ALJ that even with Humira Claimant had "only partial improvement in his severe symptoms of abdominal pain, diarrhea, joint pain, and all over body aches requiring narcotics." (R. 557). The ALJ could not claim that he accommodated all of Claimant's Crohn's-related symptoms without first recognizing what they were. Having failed to do so, remand is required so that the ALJ can address Claimant's symptom testimony and RFC accommodations with greater care.

### C. The ALJ Should Requestion the Vocational Expert

At the administrative hearing, the ALJ asked the VE if jobs were available to an individual with Claimant's RFC. The VE testified that Claimant could work as an usher but that most of those jobs were part-time only. The VE did not state the number of usher jobs that exist in the national economy but estimated that "approximately five to ten percent of these jobs are

performed on a full-time basis. I'm going to go with the five percent, which is 5,700 jobs." (R. 56). The VE also stated that a person with Claimant's RFC could work as an arcade attendant but that only half of the jobs available – 137,000 – would fit the ALJ's description of Claimant's work abilities. (R. 56-57). The VE further identified the job of an information clerk and reduced the number of positions available to a person like Claimant by 90 percent. (R 55-57). Claimant argues that the ALJ erred by failing to obtain an explanation of how the VE estimated the number of jobs that he could perform.

Unlike the first four steps of the sequential analysis, the Commissioner bears the burden at Step 5 to show that a significant number of jobs exist in the national economy that a claimant can perform. 20 C.F.R. § 416.960(c)(2). That places responsibility on the ALJ to ensure that the job numbers the VE cites are "the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018). "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008). To determine the number of jobs available, a VE does not look to the Dictionary of Occupational Titles ("DOT") which classifies and describes jobs; rather, the ALJ must consult the Department of Labor's Occupational Employment Statistics which references a separate job classification system set out in the Standard Occupational Classification ("SOC"). *Chavez*, 895 F.3d at 965.

The ALJ stated that the VE estimated the number of available jobs based on the VE's "education, experience and placement of individuals in jobs." (R. 21). The VE never made such claims, however, and the ALJ did not ask him to explain the basis for his job estimations. The VE stated at a later point in his testimony that he relied on his "professional observations throughout [his] career" to determine that a person who would be off task more than 15 percent

of the time could not work and that such a finding was "not inconsistent with the DOT." (R. 59-60). The issue at hand, however, does not involve job descriptions under the DOT or the degree to which a person can be off task during a work day. It concerns an estimation of job numbers that falls outside the scope of the DOT. *See Chavez*, 895 F.3d at 965 (noting that the DOT does not provide "an estimate of how many of those positions exist in the national economy"). The VE never suggested that his earlier testimony about the number of available jobs was based on his personal experience.

Even if the VE had made such a statement, the ALJ still erred by failing to elicit an adequate explanation of how he reached his conclusion. "While a vocational expert is entitled to rely on her expertise, she must explain her reasoning, or else an ALJ's decision based on her testimony cannot be said to be supported by 'substantial evidence,' as is required by the regulations." *Swaiss ex rel. Swaiss v. Berryhill*, No. 16 C 2536, 2017 WL 2952282, at *8 (N.D.Ill July 10, 2017). The Seventh Circuit has emphasized that even when a VE invokes his or experience, the VE must still explain "how past experience and 'knowledge' could enable him to determine numbers of particular jobs." *Hermann*, 772 F.3d at 1113; *see also Chavez*, 895 F.3d at 969 ("An affirmative explanation for the estimates [the VE] produced was required, for without one there was no evidentiary foundation on which the ALJ rest a finding of reliability."). Contrary to this requirement, the VE never described anything specific about his knowledge or experience in estimating job numbers. The ALJ therefore had no basis for adopting his testimony on the issue.

That said, both parties have waived their respective rights to dispute or defend the ALJ's erroneous reliance on the VE's testimony. The Commissioner has failed to respond to Claimant's argument concerning the VE's job estimations even though the issue was clearly

raised in Claimant's opening brief. It is well settled that a party's failure to respond to an issue addressed in a summary judgment motion waives the matter. *See Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir. 1999). Moreover, Claimant's counsel failed to question the VE at the hearing on his testimony about the job numbers. (R. 60-63). That waives Claimant's right to raise the issue at this stage. *See Dahl v. Saul*, No. 18 C 676, 2019 WL 4239829, at *3 (E.D.Wis. Sept. 6, 2019) (citing cases). For these reasons, the Court does not base its remand on the ALJ's failure to question the VE. Since this case requires remand on other grounds, however, the ALJ is directed to remedy his oversight by eliciting an adequate explanation from the VE as to how he estimated the number of jobs that might be available to a person with Claimant's RFC.

## III. CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment [18] is granted. The Commissioner's motion for summary judgment [32] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) re-evaluate plaintiff's symptoms using the criteria set out in SSR 16-3p, (2) reassess the RFC, (3) restate the reasons for the weight assigned to Dr. Schmid's and Dr. Greco's reports, and (4) obtain an explanation from the VE concerning the number of jobs that are available to Claimant.

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: January 23, 2020**